# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SERGIO XULA,                            )
                                        )
            Plaintiff,                  )
                                        )       No. 15 C 4752
      v.                                )
                                        )       Judge Sara L. Ellis
CHASE BANK, J.P. MORGAN CHASE,          )
                                        )
            Defendant.                  )

## OPINION AND ORDER

Dissatisfied with his new job assignment after returning from medical leave, Plaintiff

Sergio Xula resigned his position with Defendant JP Morgan Chase Bank, N.A. ("Chase") and

filed this suit. Xula brings claims for interference and retaliation in violation of the Family

Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Chase now moves for summary

judgment on Xula's claims. Xula has identified material disputes as to whether Chase assigned

him to a position equivalent to the one that he held before his leave and whether his leave was a

significant factor in that assignment. But Xula cannot recover for FMLA interference or

retaliation because he does not suggest a basis to find that any FMLA violation harmed him, with

the evidence instead establishing that he voluntarily resigned from his position without providing

Chase with an opportunity to address the alleged violations.

## BACKGROUND[1]

### I.     Xula's Employment History with Chase

On January 31, 2005, Xula began working for Chase as a personal banker at its

Warrenville, Illinois branch. Xula worked at various branches in Illinois until 2010, when he

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts, the additional facts included in Xula's response, and the accompanying exhibits. All facts are taken in the light most favorable to Xula, the non-movant.

transferred to California. Beginning in December 2011, Xula held the position of business banker at Chase's Torrance Avenue and PCH branch in Redondo Beach, California. He also worked out of the Torrance Main branch in Torrance, California for several weeks in February 2013.

Both branches belonged to the Orange County LA South market ("LA South"). Xula reported to an area manager, who in turn reported to the LA South market manager, a position filled during the relevant time periods by Joseph Skowera and Sue Baaden. As a business banker, Xula's responsibilities included business sales and revenue growth at his assigned branch, developing client relationships, selling credit products, and servicing business clients. Upon taking the business banker position in 2011, Xula viewed the Torrance Avenue and PCH branch as a new build because it did not have an existing book of business. A year later, on December 11, 2012, the Torrance Avenue and PCH branch had in its business banking portfolio twelve clients with a daily average of $409,495 in deposits and $200,677 in outstanding business banking attributable credit.

On June 19, 2012, Rolland Mattoon, then Xula's area manager, gave Xula a written warning for unsatisfactory performance based on Xula making promises to customers that the branch could not keep, engaging in combative behavior with branch management, failing to take proper precautions when processing new account transactions, and opening accounts without proper customer identification and signed signature cards. Several months later, on October 30, Huy Doan, who took over from Mattoon as Xula's area manager, placed Xula on a performance action plan. The plan required Xula to book a minimum of ten appointments each week with customers and prospects and identified the dollar amounts of direct deposit accounts and credit booked as areas for development. Unhappy with the discipline, Xula sent a letter to Baaden on

November 2, which recounted his issues with Doan. Specifically, Xula indicated that Doan suggested that he look for a job at other banks in response to Xula's complaints about Doan's expectations. Xula also indicated that Doan dismissed Xula's suggestion that he could take on a small business specialist role. Xula told Baaden that he interpreted Doan's comments as a message that Chase no longer wanted him.

The following month, Xula received a needs improvement rating for his 2012 year-end performance review. Doan noted that Xula had the relationship selling skills to be an effective business banker or relationship manager but that he lacked discipline and needed to improve on internal partnerships and client building skills. Doan noted Xula's goal of becoming a relationship manager and suggested that he needed to improve on his business and credit acumen to progress toward that goal. Doan indicated that Xula had improved in all areas since November. Responding to the performance review, Xula noted that having a book of business would help his performance.

## II.    Chase's Business Banking Realignment

In October 2012, Chase began a national realignment of its business banking line of business, which involved merging the business banking and relationship manager positions. Xula learned of the planned realignment in mid-2012. Chase completed the realignment on April 1, 2013, when it officially eliminated the business banker role. The transition of business bankers to relationship managers did not amount to a reduction in force or a layoff. Chase generally transitioned business bankers into its relationship manager I position, although some business bankers took on the less-demanding role of a small business specialist.

Chase compensated relationship managers differently than business bankers, with semiannual instead of monthly incentives. To ease the transition, Chase built into its

compensation plan a transition payment for the second quarter of 2013 based on the business banker's historical incentive earnings. Chase also provided for a draw payment in the third quarter. The benefit package did not change.

Xula testified that he viewed the relationship manager and business banker positions as "essentially the same job." Doc. 93 ¶ 74. But where the business banker role was reactive, the relationship manager role was proactive and required the employee to manage and grow a portfolio of business clients with at least $500,000 in annual revenues by building external referral sources and offering more complex products and services. Relationship managers covered clusters of branches, instead of just one branch as the business bankers had. In creating the clusters, Chase considered the prospects, existing book of business, business banking clients, and asset and lending size of each branch, as well as the branch's proximity to other branches. Chase sought to make the clusters as equal as possible, with each cluster having a portfolio of at least $500,000 in revenue from existing and prospective customers. As part of the realignment, Chase assigned at least ten business bankers in the LA South market to clusters that did not include the branch at which the business banker had worked. At least six of these business bankers also changed area managers, with another six having clusters ten or more miles away from their pre-realignment branches.

By December 6, 2012, Chase placed the Torrance Avenue and PCH branch in the Riviera Torrance cluster along with the Riviera and Torrance Village branches. As of December 11, 2012, these three branches had 200 existing business banking clients with a daily average of $10,472,697 in deposits, $2,671,001 in outstanding credit, and 386 prospective business clients with over $500,000 in revenue within a three mile radius of the branches. The Riviera branch, located approximately one mile from the Torrance Avenue and PCH branch, had a business

banking portfolio of 147 clients with a daily average of $7,459,442 in business banking deposits and $2,220.324 in outstanding credit. The Torrance Village branch did not have an assigned business banker. Chase assigned the Riviera Torrance cluster to Marques Swayne, the business banker at the Riviera branch. Swayne received an exceeds rating for his 2012 year-end performance review. Chase did not consider Xula for the Riviera Torrance cluster and did not assign him to any cluster as part of the reassignment because he had already provided Chase with notice that he was moving to Illinois.

### III. Xula's Attempts to Return to Illinois

Chase has an FMLA policy. It provides that, after it learns an employee's leave may arise from a qualifying FMLA event, Chase will notify the employee within five business days whether he satisfies basic FMLA eligibility requirements. Caring for a parent with a serious health condition amounts to an FMLA qualifying event. The policy further indicates that an employee should notify his manager of the need for FMLA leave, or at least the need to take time off due to a medical condition, with as much advance notice as possible so that the manager can file a formal request for FMLA leave. Chase then requires that the employee and health care provider provide certain medical information within fifteen calendar days of the request.

In November 2012, Xula began discussions about transferring back to a job in Illinois because his family needed additional assistance in caring for his mother. To transfer to a different position within Chase, a current employee must seek out and apply for internal positions. Typically, a transfer requires the employee to have a meets expectations or better rating on his most recent performance evaluation. If the employee does not have such a rating, the employee must obtain the approval of the HR business partner to transfer.

On December 18, Xula contacted Chase area managers in the Chicagoland area about available positions in Illinois. On January 10, 2013, Xula sent the Chicago area managers and Doan a follow-up email, emphasizing his need to return to Illinois to care for his mother by April 1. He indicated that he had shared his timeline for the move with Doan. Doan testified that Xula's references to health and family in the January 10 email would have caused him to refer Xula to the HR department, but Xula denies that this happened.

On February 1, Sharon Jones became Xula's area manager. She testified that she understood that Xula was resigning his position in California and looking for a new position with Chase in Illinois. The day before she became his area manager, Xula sent Jones an Outlook calendar notice indicating he would not be at work between March 20 and April 1, time Jones understood Xula to be taking as vacation days to pack his belongings and move back to Illinois.

On February 15, Xula again sent an email to the Chicago area managers in which he expressed anxiety about his job prospects in Illinois as the date of his move approached. Xula did not include Jones on the email. On February 25, Xula sent another email to the Chicago area managers, this time copying Jones. In the email, he reiterated his availability to begin work on April 1. Jones forwarded the email the same day to Baaden. Jones and Baaden discussed Xula's mother's medical issues and his need to return to Illinois, and Baaden then forwarded Xula's email to HR Business Partner Wendy Roberts. As of that date, neither Jones nor Baaden had discussed the impact of Xula's mother's illness on his work needs or potential eligibility for FMLA leave. Jones testified that she had no indication that Xula potentially needed FMLA leave, and that, when he raised the issue around that time, she immediately told him to call Chase's disability management service to explore his options. On February 28, Xula called

Chase's AccessHR hotline to ask about the FMLA leave policy and his FMLA eligibility, receiving instructions to speak to his manager.

That same day, Xula applied for two relationship manager II positions in Orland Park and Bloomington, Illinois. In his applications, Xula listed an Aurora, Illinois townhouse that he owned as his address and Illinois as his place of residence. On March 1, a Chase recruiter informed Xula that Chase did not have a position for him in Illinois. Frustrated that he did not have a position in either Illinois or California, Xula told Jones he would either go on leave or take vacation time. Jones testified that she suggested that Xula contact HR to explore his options if he wanted to take leave, but Xula does not recall that suggestion. Jones told Xula he had not been included in the realignment and did not have a new assignment as part of the realignment based on his earlier stated intention to move to Illinois to care for his mother. Jones also informed Xula that, if he was not in a relationship manager role on April 1, he would not receive the transition payments provided to former business bankers as part of the realignment.

## IV.     Xula's FMLA Leave and Post-Leave Assignment

On March 4, Xula emailed Jones to request FMLA leave, beginning immediately. Xula and his mother's health care provider then completed the required FMLA certification paperwork on March 15. Chase provided Xula with twelve weeks of FMLA leave to care for his mother, beginning on March 4 and ending on May 24. Jones remained Xula's manager during his FMLA leave.

While on FMLA leave, Xula claims his mother's care occupied his entire time. But he also had time to operate a restaurant called Sabor Guatemalteco through Sxula Services Corporation, which he incorporated in Illinois on January 15, 2013. Xula testified that Sabor Guatemalteco operated between April and November 2013. Despite the fact that Chase's Code

of Conduct requires employees to receive pre-clearance for their affiliations with other businesses as directors, officers, or owners, Xula did not inform anyone at Chase about the restaurant. But Xula claims that he did not earn any income from the corporation and so did not need to disclose it to Chase.

Chase's FMLA policy provides that an employee returning to work after FMLA leave may return to the same or an equivalent job. On April 9, Jones told Roberts that, under this policy, Xula had job protection through May 24. The following day, Xula contacted Jones and informed her he intended to return to California after his FMLA leave because he had not found a position in Illinois. Jones relayed this information to Roberts. Baaden and Jones then searched for a position for Xula. On May 10, John Michler resigned as the relationship manager for the Torrance Main cluster, which included the Torrance Main branch at which Xula had worked in February 2013. Michler's resignation created an opening, and Chase reportedly sourced candidates for that position between May 10 and June 19. Instead of considering Xula for the Torrance Main cluster, Chase decided to incorporate the Torrance Main cluster into the Torrance Del Amo cluster. It assigned Xula to the relationship manager position at the Alondra/Bellflower cluster, with Elizabeth Bowlin as his area manager. Jones notified Xula of his post-leave assignment on May 14.

The Alondra/Bellflower cluster, located in the LA South market, consisted of the Alondra, Bellflower, and Pico Whittier branches. As of December 11, 2012, the Alondra/Bellflower cluster had 203 existing business banking clients with a daily average of $7,486,439 in deposits, $2,091,845 in outstanding credit, and 343 prospective business clients with over $500,000 in revenue in a three mile radius of the three branches. Bowlin viewed the Alondra/Bellflower cluster as a diverse market with small and big businesses and potential

growth opportunities. Baaden testified that the cluster had a stronger book of business than the Riviera Torrance cluster. Xula noticed that the Alondra/Bellflower cluster had different demographics of the cluster than his prior branch. He characterized the Redondo Beach area, where he previously worked, as "affluent" and his new cluster as "low to moderate income." Doc. 93 ¶ 107. Xula's new position was located over twenty miles away from his prior branch, with Bowlin acknowledging that they were "not close." *Id.* ¶ 108.

When Xula returned from FMLA leave on May 24, the Friday before Memorial Day, his base salary did not change. Bowlin testified that she was excited to have Xula on her team because of his Spanish language skills, which could be helpful for the Spanish-speaking businesses in the area. Bowlin accompanied Xula to meetings with the district manager and cluster branch managers and staff. She also provided Xula with several referral sources in his cluster. But Xula believed Chase had "set [him] up to fail" because he did not know anyone in the new area and he did not have a transferable book of business. *Id.* ¶ 110.

On Thursday, May 30, at 4:12 p.m., Xula sent Bowlin an email expressing his unhappiness with Chase's decision to place him in the Alondra/Bellflower cluster. He stated, in part:

> I don't believe I am being treated the same because of where I'm being placed following my leave of absence. I have been really thinking over the last few days about what is happening and I cannot understand the decision that Chase has made.
>
> During the interview process with the RM team their biggest concern was that I did not know anyone in the area and had no centers of influence. I was told that Chase did not want to set me up for failure. Therefore, I took the business banking role to create those centers of influence, to get to know the community, and build my book of business in the South Bay area. All that been said, I'm now back in LA and have not been return[ed] to my old job but have been transferred. Chase is clearly setting me up for failure here because I don't know the area, I don't have any centers of influence and feel like this is the Chase way of saying we don't

want you here. I had worked really hard over the last 15 months
developing what the bank has asked me to do in order to set up for
success and now it has all been taken away and frankly I don't
understand why I was not placed in my original position and was
only gone for 12 weeks. I feel like this is unlawful discrimination
and retaliation.

*Id.* ¶ 111. Bowlin forwarded Xula's email to Baaden and Roberts on Saturday, June 1, at 1:23

a.m. On the morning of Monday, June 3, Xula spoke with Bowlin by phone, expressing his

intent to resign, and then followed up that conversation with a written resignation letter. In the

letter, Xula provided his official two weeks notice, expressing his belief that Chase had taken

steps to set him up for failure in his new position and indicating "no further action [was]

necessary because I no longer feel comfortable working for JP Morgan Chase." *Id.* ¶ 113. No

Chase employee, including Bowlin, contacted Xula regarding his May 30 allegations of

discrimination and retaliation before he resigned on June 3.

Between the time Xula became a business banker in December 2011 and his FMLA leave

in March 2013, Xula earned $34,347.55 in incentive compensation. On August 16, 2013, Chase

assigned Blanca Gonzalez as the relationship manager for the Alondra/Bellflower cluster. She

had previously worked as a relationship banker at a branch located seven miles from the

Alondra/Bellflower cluster. During her first eighteen months in the position, including three

months of leave, Gonzalez earned $21,400 in incentive compensation. Over the following

eighteen months, which again included three months of leave, she earned $35,000 in incentive

compensation.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and

assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

## I.      FMLA Interference (Count I)

The FMLA entitles an employee to twelve weeks of leave per twelve-month period for a serious health condition that renders him unable to perform his job. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009) (citing 29 U.S.C. § 2612(a)(1)(D)). An employer may not interfere with or deny an employee's exercise of his right to this leave. 29 U.S.C. § 2615(a)(1). To establish an FMLA interference claim, Xula must prove that (1) he was eligible for FMLA protection, (2) the FMLA covers Chase, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take FMLA leave, and (5) Chase denied him FMLA benefits to which he was entitled. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015). Unlike a retaliation claim, interference does not require proof of discriminatory intent. *See Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005).

Chase only challenges the last element of Xula's FMLA interference claim, whether it denied Xula FMLA benefits to which he was entitled. In his complaint, Xula contends that Chase failed to reinstate him to the same or an equivalent position when he returned from FMLA leave. In response to Chase's summary judgment motion, Xula sets forth an expanded theory of FMLA interference, arguing that Chase interfered with his FMLA rights by failing to provide him with timely notice of his FMLA rights and then failing to include him in the realignment determinations in late 2012 and 2013. But this expanded theory of FMLA interference appears nowhere in Xula's complaint, which focuses solely on events that occurred after he requested FMLA leave in March 2013. Xula cannot now amend his complaint at the summary judgment stage, and so the Court addresses only whether Chase reinstated Xula to the same or an equivalent position when he returned from FMLA leave.[2] *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

---

[2] Even if the Court considered these other bases for his FMLA interference claim, the evidence does not support a finding of interference. Xula's references to needing to move back to Chicago did not sufficiently place Chase on notice of his need for FMLA leave. Initially, Xula only told Chase of his desire for a transfer and his reference to time off in late January 2013 involved the need to move his belongings from California to Illinois, not the need to provide care for his mother. *See* 29 C.F.R. § 825.302(c) ("An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."); *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 826 (7th Cir. 2012) (plaintiff failed to place employer on inquiry notice of need for FMLA leave because she did not indicate she needed time off to care for ailing parent despite having conversations about that parent's illness). Chase also properly excluded Xula from the reassignment plan because Chase assigned business bankers to new positions after learning of Xula's intent to move to Chicago by April 1, 2013, which coincided with the transition of business bankers to relationship managers. Although Xula took FMLA leave in March 2013, before the reassignments went into effect, Chase had already decided to assign the Riviera Torrance cluster to Swayne in December 2012, and Xula does not point to any requirement that Chase should have reconsidered Swayne's assignment in light of Xula taking FMLA leave. *See Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010) (interference does not occur where the employer would have taken the same action regardless of whether the employee took leave). Finally, Xula cannot contest any issues related to Chase's evaluation of Xula's performance that arose before Chase had sufficient notice of his need for FMLA leave.

With respect to that question, Xula claims that Chase interfered with his FMLA rights because it did not reinstate him to a role equivalent to his business banker position at the Torrance Avenue and PCH branch when it assigned him to the Alondra/Bellflower cluster as a relationship manager. Chase spends some time arguing that it could not reinstate Xula to his position as a business banker because it eliminated the business banker role as part of the company-wide realignment. In his response, Xula acknowledges that the FMLA did not require Chase to assign him to a position that no longer existed when he returned from FMLA leave, arguing instead that Chase should have treated him like all other business bankers and assigned him to an equivalent position as a relationship manager. The Court thus focuses on whether the Bellflower/Alondra cluster amounts to an equivalent position.

Under the FMLA, an employee has the right to reinstatement to the same or an equivalent position to that the employee held before taking leave. 29 U.S.C. § 2614(a)(1) (providing for restoration to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment"); 29 C.F.R. § 825.214. "The test for equivalence is strict," *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 977 (7th Cir. 2008), with an equivalent position defined as "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status" and that involves "the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a). But the right to reinstatement is not "unlimited": "an employee is not entitled to any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *See Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 750 (7th Cir. 2009) (citation omitted) (internal quotation marks omitted).

Xula argues that the Alondra/Bellflower position did not have the same working conditions, growth opportunities, and status as the Riviera Torrance cluster, which included his prior branch. He complains that Chase did not consider his existing relationships around Redondo Beach when assigning him to an area with less economic potential and that his lack of contacts in that area meant he would fail. Xula asks the Court to find his situation similar to that in *Isom v. JDA Software Inc.*, where a jury found interference based on testimony that the accounts to which the plaintiff was assigned after her leave did not have the same "likelihood of success, progression down the sales pipeline, or earning potential" as an account she held prior to taking FMLA leave. 225 F. Supp. 3d 880, 885–86 (D. Ariz. 2016). But Xula's former position did not include all three branches in the Riviera Torrance cluster, distinguishing the facts from *Isom*. Considering the Alondra/Bellflower cluster against his pre-leave position at the Torrance Avenue and PCH branch, Xula cannot demonstrate a lack of equivalence with respect to economic opportunities. As of December 11, 2012, the Torrance Avenue and PCH branch had 12 existing clients with a daily average of $409,495 in deposits and $200,677 in outstanding credit, and 249 prospective clients with over $500,000 in revenue. The Alondra/Bellflower cluster was a step up, with 203 existing clients with a daily average of $7,486,439 in deposits and $2,091,845 in outstanding credit, as well as 343 prospective business clients with over $500,000 in revenue.[3]

But this does not end the inquiry, for the FMLA regulations also require reinstatement "to the same or a geographically proximate worksite (i.e., one that does not involve a significant increase in commuting time or distance) from where the employee had previously been

---

[3] Even comparing the Alondra/Bellflower cluster to the Riviera Torrance, the opportunities do not appear markedly different, where the Riviera Torrance cluster had 200 existing clients with a daily average of $10,472,697 in deposits and $2,671,001 in outstanding credit, as well as 386 prospective business clients with over $500,000 in revenue.

employed." 29 C.F.R. § 825.215(e)(1).  The Alondra/Bellflower cluster was over twenty miles

from the Torrance Avenue and PCH branch, "not close" to each other in Bowlin's evaluation.

Doc. 93 ¶ 108.  Xula testified that he lived in Redondo Beach before his leave, calling into

question whether his post-leave assignment involved a significant increase in his commute.  *See*

*Silverman v. Smokey Bones, LLC*, No. 8:15-cv-2944-T-17MAP, 2017 WL 10275974, at *5

(M.D. Fla. Apr. 5, 2017) (question of fact as to job equivalence where parties disputed the

increased commuting time because of the transfer); *McFadden v. Seagoville State Bank*, No.

3:08-CV-0467-B, 2009 WL 37596, at *8 (N.D. Tex. Jan. 6, 2009) (genuine issue of fact as to

"whether tripling the employee's commuting time and more than tripling the distance to the

worksite is a 'significant increase in commuting time or distance'").  Chase nonetheless cites to

*Shaw v. Donahoe* to argue that a twenty-mile commute is a *de minimis*, and therefore non-

actionable, intrusion.  No. 11-2859-STA-tmp, 2014 WL 1168572, at *19 (W.D. Tenn. Mar. 21,

2014); *see* 29 C.F.R. § 825.215 (f) ("The requirement that an employee be restored to the same

or equivalent job with the same or equivalent pay, benefits, and terms and conditions of

employment does not extend to de minimis, intangible, or unmeasurable aspects of the job.").

But the analysis from *Shaw* on which Chase relies appears in the magistrate judge's report and

recommendation as to whether a relocation amounted to an adverse employment action for

purposes of a religious discrimination and retaliation claim, with no mention of the FMLA

regulations at issue in this case.  *Shaw*, 2014 WL 1168572, at *18–19.  Further, the district court

disagreed with the magistrate, noting that a genuine dispute "arguably exists" about whether the

reassignment amounted to an adverse action.  *Id.* at *4–5.  The Court similarly finds *Hendrix v.*

*White* distinguishable because the court again considered the issue of a longer commute as part

of its analysis of whether the transfer amounted to an adverse action. No. 17-cv-06467, 2018 WL 3374749, at *4 (N.D. Ill. July 11, 2018).

Chase also points out that it assigned at least six business bankers in the LA South market to clusters over ten miles from their pre-alignment branches and so treated Xula the same as he would have been if he had not taken FMLA leave. *See* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."); *Torzewski v. COSCO Shipping Lines N. Am. Inc.*, No. 18 C 04266, 2019 WL 4735486, at *6 (N.D. Ill. Sept. 27, 2019) (noting that defendant's argument that the plaintiff "would not be entitled to return to his position in Chicago if he would have been relocated regardless of whether he took leave" because of a business restructuring had "*some* merit"). But this only creates a question of fact as to whether Xula seeks greater benefits than those to which he would have been entitled if not for his FMLA leave, a question for a jury to decide.

Additionally, the record does not clearly establish whether Chase provided Xula with equivalent pay. Although Xula's base compensation remained the same in his new position, a question remains as to whether Chase considered Xula eligible for the transition pay it offered former business bankers for the second quarter of 2013. *See* 29 C.F.R. § 825.215(c)(1)–(2) (indicating that equivalent pay also includes any bonuses or payments made to employees during the FMLA leave period). Chase argues that Xula did not receive this payment because Chase paid it on August 31, 2013, months after Xula resigned. The parties do not discuss whether Xula would have been eligible for the pay had he remained employed on August 31, however. Xula maintains that Jones advised him he would not receive the transition pay if he was not in a relationship manager position on April 1. This would suggest different treatment based on his

having taken FMLA leave. At the same time, Jones appears to have made her comment before Xula took FMLA leave, and Chase's 2013 business banker incentive plan document indicates that an employee on a leave of absence during the second quarter of 2013 "may be eligible for a prorated portion of their transition payment based on the number of months of the quarter they are considered 'active.'" Doc. 102 at 30. This only creates another question of fact, which, when considered along with the question of geographical equivalence, prevents the Court from concluding that Chase restored Xula to an equivalent position after his FMLA leave.

## II.    FMLA Retaliation (Count II)

For his FMLA retaliation claim, Xula must prove (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two. *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018). The Court evaluates an FMLA retaliation claim in the same way as retaliation claims under other employment statutes. *James v. Hyatt Regency Chicago*, 707 F.3d 775, 781 (7th Cir. 2013). Although Xula discusses both the so-called direct and indirect methods of demonstrating retaliation, the Court considers the evidence as a whole to determine whether a reasonable jury could infer retaliation. *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2012)). Chase argues that Xula cannot meet the adverse employment action and causation requirements of this claim.

### A.    Adverse Employment Action

Xula argues that not only was his assignment to the Alondra/Bellflower cluster materially adverse but that Chase also constructively discharged him for taking FMLA leave.[4] A materially adverse action includes "any action[ ] that would dissuade a reasonable employee from

---

[4] To the extent Xula contends that Chase retaliated against him by ignoring his FMLA notice or excluding him from cluster assignments, the Court does not address these allegedly adverse actions for the reasons discussed in note 2.

exercising his rights under the FMLA." *Breneisen*, 512 F.3d at 979. A materially adverse action "must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities." *James*, 707 F.3d at 782 (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120 (7th Cir. 2009)). With respect to a transfer or reassignment, "an action is not materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009).

Chase argues that Xula's longer commute does not make his post-leave assignment an adverse action, equating the changed location to a mere inconvenience accompanying what Chase otherwise views as a promotion. *See Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) ("By and large a reassignment that does not affect pay or promotion opportunities lacks this potential to dissuade and thus is not actionable."). On its own, the longer commute likely does not suffice to establish an adverse action. *See Hendrix*, 2018 WL 3374749, at *4 ("Although Benigno determined that Plaintiff should be transferred from the Schaumburg facility to the Naperville facility, that transfer (to the same position, with the same pay and benefits, but with a longer commute) cannot qualify as an adverse action (absent some further showing not present here)."). And while a close question, considered in conjunction with whether Chase intended to provide Xula with the transition pay it gave other transitioned business bankers, a dispute exists as to whether Xula's assignment to the Alondra/Bellflower cluster amounted to materially adverse action or only a non-actionable inconvenience. *See id.*; *Snyder v. Livingston*, No. 1:11-CV-77, 2012 WL 1493863, at *12 (N.D. Ind. Apr. 27, 2012) (although the loss of a bonus does not amount to an adverse employment action unless the bonus

is automatic, the loss of an opportunity for a bonus can support a finding that an employee suffered an adverse employment action).

But the same does not hold for Xula's claim of constructive discharge. Constructive discharge occurs "when, from the standpoint of a reasonable employee, the working conditions become unbearable." *Wright v. Ill. Dep't of Children & Family Servs.*, 798 F.3d 513, 527 (7th Cir. 2015); *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). This can occur where "*the employer's actions* communicate to the employee that she immediately and unavoidably will be terminated." *Wright*, 798 F.3d at 528–29. Xula argues that he knew from prior experience when Chase was working an employee out of a job. And he claims that from this experience, he perceived that Chase intended to force him out, beginning in 2012 when Doan placed him on a performance improvement plan and culminating in his assignment to the Alondra/Bellflower cluster. Xula specifically argues that the cluster's demographics suggested he could not meet his second quarter goals and so would be fired. The Court has already discussed how the Alondra/Bellflower cluster did not have the negative economic or production implications Xula seeks to draw, and his subjective impressions of the position do not support a finding of constructive discharge. *See Pa. State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004) ("The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"); *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) (employee's "purely subjective preference for one position over another" does not amount to a constructive discharge).

More importantly, the record does not allow for the inference that Chase took any action to suggest that it would immediately and unavoidably terminate Xula. Xula seizes upon the fact

that he sent Bowlin an email on May 30 expressing his concerns and that Chase did not take any action before his resignation on the morning of June 3. But this lack of response, essentially spanning one business day, does not suggest imminent termination. *See Wright*, 798 F.3d at 530 (no evidence of constructive discharge where employer "had not told Ms. Wright that she would be fired, nor did her supervisors' conduct suggest such a result was a certainty"). Nor can Xula point to experiencing any circumstances similar to those that courts have found to support constructive discharge. *See, e.g., EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002) (constructive discharge occurred where plaintiff arrived at work to find boxes of her belongings and her office converted to storage space); *Bernstein v. Consol. Foods Corp.*, 622 F. Supp. 1096, 1102 (N.D. Ill. 1984) (question of fact as to constructive discharge where "after [plaintiff] complained that his new job was a 'sham,' he was told that there was no other place for him in the company and that he might want to look elsewhere"). Instead, by resigning so soon after alerting Chase to his concerns about his assignment, Xula prevented Chase from having "a reasonable chance to work out a problem." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001); *see also Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 704 (7th Cir. 2001) (no constructive discharge where, among other things, employee only stayed in her new role for three weeks, failing to give "the new regime more time before quitting"). Indeed, Xula did not even wait for such a discharge process to even commence before submitting his resignation. *Wright*, 798 F.3d at 531 ("That Ms. Wright *may* have been discharged at the conclusion of the disciplinary proceeding does not amount to a constructive discharge."). Because Xula has not pointed to any evidence to create a dispute as to whether Chase constructively discharged him, he cannot proceed on his FMLA retaliation claim based on this alleged adverse action.

### B. Causation

Because a question of fact exists as to whether the assignment to the Alondra/Bellflower cluster amounts to an adverse employment action, the Court also must consider Chase's argument that Xula cannot establish a causal connection between his FMLA leave and that assignment. In reply, Chase argues that Xula must demonstrate "but for" causation, relying on *University of Texas Southwest Medical Center v. Nassar*, in which the Supreme Court held that Title VII retaliation claims require "but for" causation. 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013). Xula instead contends that he "does not need to prove that "retaliation was the only reason for" the adverse action and instead "may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Goelzer*, 604 F.3d at 995 (quoting *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008)). The Seventh Circuit has declined to decide whether *Nassar* raises the causation standard for FMLA retaliation claims. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir.2014) ("Our circuit has not addressed, and the parties have not briefed, whether but-for causation should apply to FMLA retaliation claims in light of *Gross* and *Nassar*. We need not resolve the question here, however, because [the plaintiff] can avoid summary judgment on both claims even if but-for causation applies[.]"). The Court therefore continues to apply the motivating factor test to Xula's FMLA retaliation claim. *See Haworth v. Round Lake Area Schs., Cmty. Unit Sch. Dist. 116*, No. 17 C 7038, 2019 WL 3080928, at *5 n.2 (N.D. Ill. July 15, 2019) (collecting cases continuing to apply the motivating factor test after *Nassar*); *Hall v. Bd. of Educ. of City of Chicago*, No. 14-cv-3290, 2018 WL 587151, at *7 (N.D. Ill. Jan. 29, 2018) ("Because the Seventh Circuit has not held that an FMLA plaintiff must prove but-for causation,

this Court continues to follow a line of FMLA cases requiring only substantial-factor causation.").

Xula mainly focuses on Chase's actions before he took his FMLA leave. But any decisions Chase made because Xula indicated he planned to move to Illinois do not play into the causation analysis, where Chase made these decisions before Xula placed it on notice of his intent to take FMLA leave. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). And although Chase has not identified any similarly situated employees treated in the exact same manner, "perfect congruence" is not required, and it appears that Chase at least treated a number of other business bankers who did not take FMLA leave similarly by transferring them as part of the realignment to positions over ten miles from their pre-cluster assignments and under different area managers. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018) ("Perfect congruence is not required, however. The question is whether the two employees are situated similarly enough for reasonable comparison.").

Xula also argues that the fact that Chase did not consider him for the open Torrance Main cluster after he revealed his plans to return to California after his FMLA leave suggests causation. This position became available on May 10, before Chase informed Xula of his post-leave assignment, and included a branch at which Xula had previously worked. Chase argues that nothing in the record suggests that Chase did not consider him for this position but sets forth no evidence to establish that it did. But a juror could reasonably infer that Chase did not consider Xula for the position from Chase's tracking spreadsheets, which indicate an opening for

the Torrance Main cluster existed through mid-June but do not list Xula as a possible candidate, as well as from Jones' testimony that Chase had only one cluster—Alondra/Bellflower— available at that time. Although admittedly weak evidence of causation, given that Jones informed Xula of the Bellflower/Alondra cluster assignment on May 14, after the Torrance Main position came open, a juror could question whether Xula's decision to take FMLA leave played a role in Chase's decision to assign him to the Alondra/Bellflower cluster, instead of the closer Torrance Main cluster. *See Malin*, 762 F.3d at 562–64 (denying summary judgment on FMLA retaliation claim because a plausible reading of the evidence suggested that the employer excluded the employee from consideration after learning of her FMLA leave request).

## III.    Availability of Relief

Questions of fact prevent the Court from finding that Xula's post-leave assignment to the Alondra/Bellflower cluster does not amount to a violation of the FMLA under either an interference or retaliation theory. But even if a plaintiff establishes a violation, "§ 2617 provides no relief unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89, 122 S. Ct. 1155, 152 L. Ed. 2d 167 (2002). Chase argues that Xula cannot demonstrate any prejudice because Xula voluntarily resigned from his relationship manager position after working only five days without giving Chase the opportunity to investigate his complaints. Had Chase constructively discharged Xula, that would satisfy § 2617's requirement. But the Court has already determined that Xula cannot make such a showing. Xula has not otherwise responded to Chase's argument that the lack of prejudice warrants summary judgment in its favor, and the Court will not construct arguments for Xula in an attempt to find a genuine issue of material fact. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (the court is not "obliged to research and construct legal arguments for parties,

especially when they are represented by counsel"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). Therefore, because Xula has not suggested any basis for finding the alleged FMLA violations prejudiced him to allow him to recover for those violations, the Court grants summary judgment for Chase on all of Xula's claims.

## CONCLUSION

For the foregoing reasons, the Court grants Chase's motion for summary judgment [95]. The Court enters judgment for Chase on Xula's complaint and terminates this case.

Dated: November 6, 2019

_____
SARA L. ELLIS
United States District Judge